Bill 103390 D.H.L. v. Andre Gottschalker Bill 103390 D.H.L. v. Workers' Compensation Commission Well, what opinion is that? Is that an actual opinion? First of all... Well, what if that's true? What if that happened? Is that not compensable? That's not what the doctor said. Oh, really? The doctor said, there's a lot of speculation here, but somehow it must be. Now, the first question is, what does he get to talk about? The guy has said, the doctor has been consistent. Dr. Westman has been consistent with these guys. Post-onsectomy arthritis. Onsectomy arthritis was made in 1999. And that is the diagnosis leading to need surgery, leading to replacement. He never said anything. He said, there's a lot of speculation here, but somehow it might have aggravated. And this is actually, it didn't require aggravation. It could be inevitable. But is that an opinion that's supportive? Is that a scientific opinion that's supportive? There's a lot of speculation here. It seems that after you throw the virgins in the volcano... Is that a legal term? It's interesting speculation, which is what the doctor labeled it as. But can you say, do you have an opinion to a reasonable degree of scientific medical certainty as to whether or not virgins in the volcano affect head and heart? And here he is. Can he give an opinion? Anyone has to say a reasonable degree of scientific certainty that one is connected to the other. Is there a causal connection or temporal connection? He's already said for years, the guy is going to have this. It's going to happen. So it accelerated deterioration. You're sidestepping the argument. If that's, in fact, what the commission believes Weston's testimony came to, and, of course, Weston was the claimant's longtime treating physician. The claimant testified, Walsh spent about eight minutes examining him. Tell us why the commission could not adopt the testimony of Dr. Weston. Why they were precluded from doing that. The first question is, why the accident? Because the arbitrator watched a demonstration as to what happened. And there was a lot of talk about it. This thing is 18 inches, 10 inches or so high. This is what they call a tie-down. It's a big, big truck. It's a UPS truck. It's very high. It steps down. It's probably about 14 inches high off the ground. But, as the guy points out, the curve he's stepping onto is eight inches above the ground. So he's only stepping down. That's at 0, 0, 0, 54, and 72. And it's not so big at all times. That's what he's demonstrating. He's stepping down to the curve. So he's only stepping down. I'm not scared. And there's no twisting or anything. He just stepped down and extended it and it hurt. Practical thing. It's going to heal up. But, in any case, what was that? He had some FEMA to it. But there's no evidence that that actually was an accident. Because there's nothing wrong with the curve. Nothing wrong with the truck. Well, he jammed it. It can happen. He jammed a knee. He jammed a knee. Except, I assume you're not jumping off a truck 75 or 85 times a day, are you? Well, the fact of the matter is the arbitrator passed his demonstration and said that's wrong. And the commission said it was. And the commission went round and round and put in a bunch of stuff. Not the record. He was distracted by the impact. He never said that to me. That's wrong. The commission gets wide with that unfettered authority to be able to fix. And just adding things that aren't there because they wish they were there to make things easier is not one of their points of authority. If he doesn't say anything about being distracted, he's supposed to work on things. He stepped out. Why does he need to even be distracted? Why is any of that even particularly relevant? I mean, couldn't he just have jammed his knee, stepping off a truck, which accelerated the deterioration and accelerated the need for surgery? Why is that not in the record? If he just steps out on the curb, what's the accident? The accident is stepping off on the curb 75 to 85 times a day. He's in the course of his report. Right. Doing his job. We all agree on that. Right. But if he's stepping off on the curb, is that any more than anybody else does walking down the street? Not if you're doing it 75 to 85 times a day. That's in the mixture that you can't overlook. I would agree with you if it was a one-time deal. But the record says it wasn't. People take that kind of step every day, walking up and down stairs. It's just a truck to the curb. 75 to 85 times a day. Right. But the doctor has already told you it's inevitable. So in the accident, so the next question is, is it a cause of action? Let's assume that there is an accident. He had a temporary strain or some temporary aggravation to the existing condition. It accelerates the need for the replacement. There's nothing in there by the doctor that says, I'm going to need a remover, which I'm sure is the cause of the acceleration. He says, this is speculation. So Weston actually supported your argument that stepping off the curb had nothing to do with his condition. Is that what you're telling us? Because his condition was improving. He had edema immediately after the break through. So does Weston support your case? Actually, Dr. Weston supports it all the way back to 2003 when he says, this guy's going to have a knee replacement and it is inevitable, aggravation or no aggravation. So I understand your argument. He's going to clearly need a knee replacement someday. So whatever happens in the job before then is irrelevant in your argument, correct? Because he's going to go anyway. So what's the big deal, right? He also said that it was just a matter of luck that he hadn't needed a three. And that's why he was embraced in it. I am a little more current. So he wanted three years. And the guy didn't want to embrace him. He wanted to write up. So soon. But the doctor was going to say that someday he's going to leave this when he's old and ready to retire. He said, this is common. It's common soon. Wear this brace. Do not go back to this kind of job. This is what he said in 2003 at the FCE. He said, do not go back to this kind of work. Take it easy. Wear this brace. It's common. It's not a long off in the future. It's around the corner. It's a matter of luck he hadn't needed it already. And he talked to her. I am a little more current. So there's absolutely nothing in Dr. Westman's testimony other than his saying, oh, yeah, this is speculation that they've miscalculated. But that's not what he said in all the records. That's not what he said before. And it's not what happened. And as far as his return to work, there's only testimony. The only reason he can't return to the job is because the place is more aware of the artificial need. There's nothing the guy can't do. He does what he wants. And he ends up doing baseball, umpiring, crowd shooting, running, and all the things that are involved in that. But then he says, I can't go over it. It's a matter of something he's not aware of. He's been in the class 20, 30 years, you know, less than a farmer in the KC. And so there's no reason for him to advance the law of war. But the need in place is absolutely nothing to do with any agency that he had to work for. It's just a result, as the doctor said, it's inevitable. And in twice the time, he says that it's inevitable that it's going to have an effect on the employer at work. Twice over 20 years. If it's inevitable that it's going to have an effect on the employer at work, it's not going to happen. Counsel, please. Please, your Honor. Thank you, Your Honor, for the testimony. Let's also describe to our jury the issues at play, the question of how to block a connection, as well as the need to teach. Counsel, in the course of addressing the argument, can you address the two main components of his argument? I think you can fairly break it down as follows. Since apparently there's evidence in the record that the knee was going to have to be replaced at some point, he has this jamming and hurting his knee at work. Since it's going to have to be replaced at some point, he doesn't believe that should be the principle. So how do you respond to that? My response would be, of course, holding the procedural case, Your Honor. The normal theory of freeing the exception is not to defeat the possibility. The fact that I finally had the knee replaced with a tomorrow, a year from now, five years from now, does not defeat the connection finding in this specific point. He steps off the stethoscope, he reads the envelopes to make sure he doesn't drop the progressive. He short-stops the curve because he's not paying attention and jams his knee. The great mechanism of the injury is what aggravates the osteoarthritic disease in the joint. The tibia and the femur where they meet, they form a joint. The rubbing together is what causes the current aggravation of the disease. It accelerates the need for surgery? Yes. Here's his counter to that argument. Okay, well, that's well and good. Let's get past that hurdle. But then he says, well, Weston really doesn't help the claim. His testimony really doesn't add anything in here because he really didn't testify that it had anything to do with their accelerated need for surgery. Do you agree with that? No, Dr. Weston's notes are clear. It was the diagnosis of traumatic knee-induced osteoarthritis, which is the diagnosis short of the partial neurophysically. He had some diagnosis of the word traumatic knee-induced. That's contained within the treaty records. It's more of my contention on the permanent aggravation of the knee condition itself. To further argue that, I would think Dr. Walsh's deposition testimony, he admitted on cross-examination that all that occurred up to the recommendation for the total knee was causally related. So what happened from the time that the recommendation was made past that, that wrote the change of subject, and that's just what happened? Mr. Dell's argument presupposes that if my client didn't sustain an accident in September of 2007, he could have woke up with the staff in his pouch on that entire day, and then had a total knee in September of the way the accident did. That's a fatal flaw, and it's too great a relief, I imagine, and that's why I'm arguing that this court can act without a deposition. Dr. Walsh also relied on an incomplete record. As my brief states, I believe he had less than 15% of the treaty records. The treaty records that date back to 1999. He also did not have the 2006 radiographs to look at and appreciate when he examined Mr. Holston. Those are relevant because, as I said, the exact condition here is he fell on a bone rubbing. He was unable to compare the 2006 radiographs to the 2007. To see it at the time my client stepped off the truck in 2007, he was stepping off with a decreased joint space. Dr. Weston obviously had those. He's been a treating physician for five to six years. I would also point out that Dr. Weston was referred by Mercy Works. Dr. Weston has a 15-year referral from the Admission and Lodging Commission. With regard to a rising outlook for others, this very court in the Metropolitan Water case, which was decided very recently, stated that there were three ways that a rising outlook can be defined. Those are those risks that are distinctly associated with employment, those that are peculiar, and those that are unusual. I would argue that the effects of this claim do not fit into personal risks. But they can be fit into distinctly associated and or neutral position. With regard to this distinctly associated, as you stated, your honor, he does step off his truck 75 to 85 times a day. He does step off with 11 stops. He is stepping off with an elevated pass. I just want you to know that the average step is 12 to 18 inches. That's some of the steps downstairs. With regard to neutral risks, I believe you can call them there. Based on the qualitative sum argument of he's distracted, he's reading the label to make sure he has the proper address. He's obviously in the course of performance time and place circumstance. He's benefiting the HR and making sure packages are brought to the proper place. With regard to the quantitative factor under the neutral or rising outlook section, as I stated just a few minutes ago, 75 to 80 percent of the stops are residential. He's approaching fairly high-volume firms as opposed to the low-volume. In addition, his decision of filming being reversed is against the manifest way of the evidence. It's an opposite conclusion clearly apparent here. I would argue that it's not. With regard to the TTP issue, I think once the facts of this claim are laid out, the laws apply. I think the arising out can be satisfied. The causal connection can be satisfied. And, of course, the TTP has to be imposed. Thank you. Mr. O'Donnell? As far as the process goes, he had an accident. This is a question. He's suffering from bipolar. He had diabetes. He had the same symptoms as the prospect. The damage was not from the accident he had. As far as going back to the frequency of suffering, that really doesn't matter. The whole thing doesn't matter because Dr. Wessler said at C241 that he was assuming he was making a mistake. But it didn't matter. A couple of inches of his knee was all he needed. Actually, this is going to be a call to action. It doesn't have to do with one or the other. It's just a coincidence that this little thing happened while he was working. It doesn't have to do with the paperwork. It doesn't have to do with the accident. It doesn't have to do with something else. So, after 103, he's going to have an accident while he's working. As far as Dr. Walsh's ability to go through the past history, we don't doubt the past history of Dr. Wessler. In fact, we rely on Dr. Wessler's history. All that Dr. Walsh did was to ask him what's his condition after this accident. And he looked at the slurring from the records shortly after the accident. He found that it was improving. The knee was improving over time. And we went ahead and had the knee replacement, which Dr. Walsh agrees he needed. Which Dr. Wessler has been pushing for, saying, well, he's not going to walk for years. And it's the whole thing about frequency and so on. It does not matter. It's what Dr. Wessler said. It doesn't matter. The accident itself doesn't matter. This guy is going to get a knee replacement. It doesn't matter what he's going to do. He can be anything. He kind of should. Or no aggravation at all. Which is exactly what Dr. Wessler said. It doesn't matter. There's no testimony. He's going to get some sort of consequence, aggravation or no aggravation. I go with Dr. Wessler. We don't doubt him at all. The court will take the matter under advisory for disposition and recess until 9 o'clock in the morning. Thank you.